# EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:** WELLS FARGO & COMPANY; and DOES 1-25, *(AVISO AL DEMANDADO):* inclusive<br><br><br><br>**YOU ARE BEING SUED BY PLAINTIFF:** JOHN SOTOODEH<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* | *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)* |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Superior Court of California, County of San Francisco<br>400 McAllister Street<br>San Francisco, California 94102-4515 | CASE NUMBER:<br>*(Número del Caso):*<br><br>**CGC-21-594449** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
CHRISTOPHER B DOLAN
DOLAN LAW FIRM, PC, 1438 Market Street, SAN FRANCISCO, CA 94102                    415-421-2800

| | | | |
|---|---|---|---|
| DATE: **09/03/2021** | Clerk, by | **JACKIE LAPREVOTTE** | , Deputy |
| *(Fecha)* | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*



**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

    under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
             ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
             ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
             ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

                                                                  Page 1 of 1

CM-010

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| CHRISTOPHER B DOLAN    SBN: 65358<br>Vanessa Deniston (SBN 284055)<br>DOLAN LAW FIRM, PC, 1438 Market Street, SAN FRANCISCO, CA 94102<br>TELEPHONE NO.: 415-421-2800   FAX NO. (Optional): 415-421-2830<br>E-MAIL ADDRESS: chris@dolanlawfirm.com<br>ATTORNEY FOR (Name): Plaintiff, John Sotoodeh | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br>**08/30/2021**<br>**Clerk of the Court**<br>BY: JACKIE LAPREVOTTE<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
~~SUPERIOR COURT OF CALIFORNIA, COUNTY OF~~ 400 McAllister Street
CITY AND ZIP CODE: San Francisco, 94102-4515
BRANCH NAME: Civic Center Courthouse

CASE NAME: John Sotoodeh v. Wells Fargo & Company; and DOES 1 - 25, inclusive    **CGC-21-594449**

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] **Unlimited** [ ] **Limited**<br>(Amount    (Amount<br>demanded    demanded is<br>exceeds $25,000)    $25,000) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br><br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[X] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [X] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action (specify): Three (3)
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: August 30, 2021

CHRISTOPHER B DOLAN
_____
(TYPE OR PRINT NAME)          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. September 1, 2021]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
Westlaw Doc & Form Builder®   www.courts.ca.gov

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**                                                   **CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
        Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice–
        Physicians & Surgeons
    Other Professional Health Care
        Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip
        and fall)
    Intentional Bodily Injury/PD/WD
        (e.g., assault, vandalism)
    Intentional Infliction of
        Emotional Distress
    Negligent Infliction of
        Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
    Practice (07)
Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
Defamation (e.g., slander, libel)
    (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
        *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach–Seller
        Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
        Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
        Case
Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
    Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
        Case Matter
    Writ–Other Limited Court Case
        Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
        Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of
        County)
    Confession of Judgment *(non-
        domestic relations)*
    Sister State Judgment
    Administrative Agency Award
        *(not unpaid taxes)*
    Petition/Certification of Entry of
        Judgment on Unpaid Taxes
    Other Enforcement of Judgment
        Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
        harassment)*
    Mechanics Lien
    Other Commercial Complaint
        Case *(non-tort/non-complex)*
    Other Civil Complaint
        *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
    Governance (21)
Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
        Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
        Claim
    Other Civil Petition

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**08/30/2021**
**Clerk of the Court**
BY: JACKIE LAPREVOTTE
Deputy Clerk

Christopher Dolan (SBN 165358)
Vanessa Deniston (SBN 284055)
**Dolan Law Firm P.C.**
1438 Market Street
San Francisco, CA  94102
Tel: (415) 421-2800
Fax: (415) 421-2830
Email:  Chris.Dolan@dolanlawfirm.com
Attorneys for PLAINTIFF
JOHN SOTOODEH

## IN THE SUPERIOR COURT OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN FRANCISCO

## UNLIMITED CIVIL JURISDICTION

**CGC-21-594449**

| | |
|---|---|
| JOHN SOTOODEH,<br><br>        Plaintiff,<br><br>    v.<br><br>WELLS FARGO & COMPANY; and DOES 1-25, inclusive,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT**<br><br>1.  Retaliation in Violation of Labor Code Section 1102.5<br>2.  Wrongful Termination in Violation of Public Policy<br>3.  Breach of contract<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Now comes Plaintiff John Sotoodeh, hereinafter (SOTOODEH or PLAINTIFF) and files this Complaint, and further alleges as follows:

### Parties to the Civil Action

1.      Plaintiff SOTOODEH is an adult natural person who is a resident of the State of California, County of Los Angeles.

2.      Defendant WELLS FARGO & COMPANY (hereinafter referred to as "WELLS "or "THE BANK," is a corporation doing business in the State of California with its principal place of

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

business located in the City and County of San Francisco.

3.      DOES 1-25 are herein sued under fictitious names.  PLAINTIFF is informed and believes and thereon alleges that DOES 1-25 are business organizations of unknown form who may have acted as employers of PLAINTIFF.  The true names and capacities, whether individual, corporate, associate, or otherwise, of DOES 1-25, inclusive, are unknown to PLAINTIFF, who therefore sues the DOE Defendants by fictitious names.  PLAINTIFF will amend this complaint to show their true names and capacities when they have been ascertained.

4.      For the purposes of this Complaint, each use of the term "THE BANK or WELLS" refers not only to named Defendant WELLS FARGO & CO, but also to DOES 1-25.

5.      PLAINTIFF is informed and believes and thereon alleges that WELLS is an employer subject to suit under the California Labor Code in that WELLS is a business organization which employed PLAINTIFF and employs others in California and its Principal Place of Business is in San Francisco, California.

## Venue and Jurisdiction

6.      Venue is proper in San Francisco because the unlawful practices alleged herein were committed in San Francisco County, and records relevant to the alleged unlawful practices are maintained and administered in San Francisco County.

7.      WELLS' principal place of business is in San Francisco and the majority of witnesses and documentation pertaining to PLAINTIFF's employment are located within San Francisco.

8.      Through, and because of, the applicable statute of limitations and various tolling agreements entered into by the Plaintiff and Defendants, this action is brought in a timely manner.

9.      Subject matter in this action is properly heard in this Court, as the action incorporates California State Law claims and the amount in controversy as set forth in the Complaint exceeds $25,000.00.

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

1

### **Facts Common to All Causes of Action**

2

**I.   Summary**

3         10.     PLAINTIFF John Sotoodeh was a career employee at WELLS' Community Bank

4  with 28 years of service. During that time, PLAINTIFF amassed a remarkable performance record

5  and worked his way up from teller to branch manager to regional manager, and ultimately to

6  Regional Bank Executive, one of three such positions within the BANK at the time, reporting

7  directly to the head of the Community Bank. PLAINTIFF had a long record of opposing, and trying

8  to change, the very policies and systemic forces that led to improper behaviors by employees and

9  that ultimately enmeshed the BANK in one of the largest scandals in the history of U.S. financial

10  institutions.

11         11.     SOTOODEH was so committed to bringing change to WELLS that he designed his

12  own "gearing model" on how to incentivize bankers; developed his own training programs

13  addressing ethics and integrity issues (some of which the BANK later adopted) on a more

14  widespread basis; instituted a more rigorous ethics certification process for all of the employees,

15  including bankers, tellers and managers, in his region than required for bankers in other regions; and

16  imposed higher standards to meet sales quality and compliance targets in his region. SOTOODEH

17  continually pushed his superiors at WELLS to alter the very policies that are now at the center of the

18  regulatory morass in which the BANK finds itself. SOTOODEH even offered to put his own

19  compensation at risk on multiple occasions to shield his direct reports from undue pressure created

20  by what he viewed as a misaligned incentive program.

21         12.     SOTOODEH's efforts to change WELLS' culture and business model, were rebuffed

22  at almost every turn by senior leadership. He was rebuffed even though the most senior officials

23  within WELLS were made aware (often by SOTOODEH, himself) of the risks created by the

24  BANK's overly aggressive and misaligned sales model.

25         13.     In fall of 2016, after public disclosure of certain problems within WELLS, the

26  BANK's Board hired outside counsel to conduct an internal investigation. SOTOODEH cooperated

27

28

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

1  in the investigation, describing his assessment of the BANK's problems, as well as his efforts to

2  corral and prevent those problems through systematic change. Even though SOTOODEH for a

3  period of time presided over a Los Angeles region at the center of sales practice scrutiny, that

4  internal investigation stated: … "multiple witnesses described SOTOODEH as having made

5  significant attempts to improve the sales culture in Los Angeles," and discussed his instituting an

6  employee recognition system and training initiatives to improve compliance.

7       14.     SOTOODEH cooperated in numerous internal investigations. Although the BANK

8  was legally obligated to indemnify SOTOODEH, the BANK insisted that, in return for paying for his

9  counsel, (something they were legally responsible for doing under the Labor Code) that he cooperate

10  with the BANK and share information about what he intended to communicate to regulators. As a

11  result, the BANK was aware of SOTOODEH's efforts to change its sales models.  The BANK was

12  also aware, or should have been aware, of SOTOODEH's role as an internal whistleblower trying to

13  effectuate change to foster greater compliance.

14       15.      Shortly before Mr. SOTOODEH was scheduled to meet with the Securities and

15  Exchange Commission, the Department of Justice, and the FBI, the BANK, knowing SOTOODEH's

16  intention to disclose his role as a whistleblower, notified him that he was being terminated.  Based

17  on its internal investigations, the BANK knew that there was no basis to find that Mr. SOTOODEH

18  had engaged in any wrongdoing.  Therefore, the termination was carried out in a retaliatory manner

19  and Mr. SOTOODEH was expressly told that he was being terminated "without cause" whereas

20  others who were culpable were terminated "for cause."

21       16.     The BANK never communicated to SOTOODEH that they considered him to be in

22  any way culpable for any misconduct. While other executives in the BANK were terminated as a

23  result of the investigations, SOTOODEH was asked to remain with the BANK, told by senior

24  management that he was considered to be an important part of the Community Bank' s future, and

25  placed on committees to help design and implement the BANK's new business model.

26       17.      However, in parallel with the BANK's internal investigation, government

27

28                                    COMPLAINT - PAGE 4

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

enforcement agencies began building their own cases against the BANK. Despite being aware that SOTOODEH was for a long time one of the few, loud, voices for institutional change, WELLS - which never communicated any basis to terminate SOTOODEH for cause - nevertheless decided to terminate his employment *without cause*. The announcement of the decision to terminate SOTOODEH came shortly before he was scheduled to be interviewed by the Department of Justice and Securities and Exchange Commission and FBI where, the BANK knew he would give testimony and information that was detrimental to the BANK's defenses.  In particular, the BANK knew that SOTOODEH would provide information that problems in WELLS were more systemic and deep-rooted than the BANK had tried to portray in its public statements, and that senior officials in the BANK had been aware of, but ignored, warning signs he himself raised.

18.     In the process of terminating SOTOODEH, the BANK reneged on earlier promises they had made orally, and in writing, to SOTOODEH to cover his relocation expenses for the move that the BANK asked him to make.  This included covering expenses associated with relocation, a guaranteed buyout of PLAINTIFF's home, and additional relocation costs and temporary housing reimbursement benefits. The BANK also refused to provide severance, informed SOTOODEH that his stock grants were cancelled, and refused to meet its statutory and contractual obligations to compensate him for the personal expenditures he was required to advance to support his various relocations over the prior year. By publicly announcing his termination, in direct opposition to the previous statements regarding his continued importance to the future of the BANK, WELLS severely damaged PLAINTIFF'S reputation, made it more difficult for him to find alternate employment, and deprived him - just two years' short of becoming eligible for retirement after nearly 30 years of dedicated employment (although he planned on working for THE BANK until he was at least 65) - of millions of dollars in equity.

**II.   <u>Plaintiff's Background and Early History With the BANK</u>**

19.     SOTOODEH grew up in a modest community in San Jose, attended San Jose State University, and earned a Bachelor's Degree in Finance

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

20.      While completing college, SOTOODEH began his career in banking with WELLS in 1990 as a bank teller in WELLS' Oakridge branch in San Jose.

21.      Within four years, SOTOODEH was promoted to Branch Manager. The BANK, recognizing SOTOODEH's dedication, acumen and work ethic, promoted him to a District Manager position in 1996. In 1998, he was chosen to be the Market President for the Peninsula Market in the Bay Area.

22.      He continued to receive promotions and was ultimately promoted as Regional President in 2006 responsible for San Diego and its surrounding areas but not extending to Los Angeles.  SOTOODEH continued to be a top performer in Southern California, not only in terms of business, but in terms of customer service, employee engagement, employee turnover, sales quality and compliance metrics.

23.      In 2009, the leadership team in the West Coast observed significant culture and compliance problems developing in the neighboring Los Angeles region. Sales performance had been high, but the means used to achieve that end were resulting in poor sales quality metrics, poor customer service scores, high employee turnover, and employee dissatisfaction. In light of SOTOODEH's record and reputation he was asked to make a lateral move from the Southern California region to L.A., where he remained for several years until being promoted to an executive position in Texas in October 2014.

**III.   Making Improvements Despite Institutional Restrictions.**

                ***A.   SOTOODEH observed problems developing in the BANK's sales model***

24.      When SOTOODEH began his career at the BANK, WELLS was much less of a "sales" organization. Banker compensation was based on increasing the volume (not *number*) of lending and deposit accounts. As such, bankers were incentivized to ensure customers actually used the products they received. WELLS focused on a lean cost structure with very few branch employees, whose job was primarily to provide service, not sales, to the customers.

25.      When WELLS merged with Norwest Bank in 1998, the merger brought a dramatic

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

shift in company culture because Norwest was much more sales-focused. The BANK introduced a large number of new account types and began hiring additional bankers to market them. It also transitioned to Norwest's "core sales" (sales goals and incentive compensation) structure that was based on the *number* of accounts or products an employee sold to a customer, rather than how much those accounts were actually used. This ultimately became known at WELLS as the "solutions" model, with each account or product sold called a "solution."

26.     The BANK enjoyed double-digit "solutions" growth for several years, but over time SOTOODEH observed that previously underserved customers now had many of the basic accounts they needed, and the opportunity for new sales began to diminish. However, the BANK continued to set goals that required unrealistically high rates of growth. The BANK'S reliance on its solutions model became a serious problem that put excessive pressure on bankers as it became harder to reach unrealistic sales goals.

27.     More and more, bankers began selling commodity-type products to meet their goals. SOTOODEH observed increasing concentrations of products including secondary checking and savings accounts to meet their goals, many of which were never funded by customers, and additional debit cards that were never activated or used by customers. He considered these types of products to be of low value (low "quality") to customers, and creating little true value for the BANK, but the solutions model gave full credit to bankers for this type of sale.

**B. Overcoming problems in the troubled Los Angeles region**

28.     The problem was particularly acute in places such as Los Angeles where the higher cost of living meant bankers were more dependent on sales-target-based bonuses to achieve a reasonable standard of compensation.

29.     When SOTOODEH was assigned to take over the Los Angeles region in 2009, he inherited a region with some of the highest rates of employee attrition in WELLS, some of the lowest customer satisfaction ratings, high numbers of unfunded accounts and accounts opened without customer signature, and bankers who appeared to have little personal connections to their

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

1    customers.

2         30.      Although he lacked the authority to modify the BANK's core incentive program,

3    SOTOODEH instituted a number of cultural changes in the region to try to reduce and address the

4    risk of misconduct created by the BANK's aggressive sales model and steer the region back toward

5    superior customer service and high-quality sales. SOTOODEH (a) set a tone from the top focused on

6    new alternative priorities for the region that focused on customer service, employee engagement and

7    retention, sales quality and ethics, rather than strictly sales performance; (b) introduced  training

8    programs designed to increase focus on ethical sales practices and give bankers the necessary skills

9    to market products to customers that they actually wanted and would use; (c) instituted quarterly

10   sales ethics certifications for all employees, which were required only annually by the rest of the

11   BANK; and (d) imposed sales quality requirements for recognition activities, including mandatory

12   thresholds for funding rates and new account signatures.

13        31.      By the time SOTOODEH left Los Angeles in 2014, there were material

14   improvements in the performance of the bankers reporting to him. Among those were improvements

15   to customer satisfaction rates, which had been among the lowest in the company before

16   SOTOODEH's arrival but were amongst the highest in the company by the end of 2013, and the best

17   in the BANK's footprint among large lead regions. SOTOODEH's employee engagement scores

18   exceeded Community Bank average and were amongst the best in the company. Employee turnover

19   metrics, which was amongst the highest in the company prior to SOTOODEH's arrival, were now

20   amongst the lowest. And the funding rates and missing signatures for deposit accounts had vastly

21   improved from near the worst in the company to amongst the best.

22        32.      SOTOODEH was able to bring about these improvements despite unwillingness on

23   the part of the BANK'S most senior leaders to change the sales methodology that was at the heart of

24   its problems.

25        33.      SOTOODEH's performance evaluations highlight his efforts and successes in

26   improving the troubled L.A. region. For example:

27

28   ───────────── COMPLAINT - PAGE 8 ─────────────

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

- Following his first year in Los Angeles, SOTOODEH's 2009 performance review recognized that before he arrived, "LA had the lowest rolling funding rates [a compliance metric that tracks whether a product is actually used by the customer], highest incidents of ethics issues and inconsistent performance. [SOTOODEH] coached and led the team to be comprehensive and see the big picture; always focusing on doing what is right for the team members, company and shareholders."  It acknowledged that "[SOTOODEH] changed the culture: LA was a widget producing organization that through [SOTOODEH's] leadership was transformed into a Region that lives the Company's Vision and Values to satisfy all of our customers' needs."

- In 2011, his performance evaluation stated that "[SOTOODEH] has done [an] incredible job managing aggressive solutions goals, while building a culture focused on doing what is right for the customer.... John and his leadership team have created environment that is about helping customers financially succeed instead of 'meeting goals'."

- In 2013, his final reviewed year in Los Angeles, the reviewer aptly recognized that "in John's 5 years in Los Angeles he has been challenged with evolving a culture to be one that is customer-centered as opposed to 'blow your sales plan away.'…It has been a pleasure to observe and support John in building a culture that does not tolerate unethical behavior."… "While the organization is often slow to adopt ideas, I would encourage you [SOTOODEH] not to lose your resilience or passion.  You [SOTOODEH] have demonstrated how to change a culture in the most troubled market in the footprint.  I believe your next chapter is to do the same for all (sic) community bank."

*C.  SOTOODEH went so far as to create his own more demanding compliance program*

34.     SOTOODEH recognized the dangers, and potential for excessive pressure on bankers, caused by the misaligned sales model and the aggressive sales culture that had previously been

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

1  fostered in Los Angeles. In order to put additional safeguards in place, SOTOODEH went to the

2  unusual step of creating his own unique compliance, ethics and training programs in his region.

3      35.    To address the negative sales culture, SOTOODEH started by instituting alternative

4  priorities in the region, focusing his tone from the top on consistent activities, employee engagement,

5  and customer service, rather than just focusing on sales results.

6      36.    Seeing that the BANK's training regimen was inadequate, SOTOODEH created his

7  own five-month training program for new managers with focus on ethics, oversight, risk and

8  compliance, leadership, and coaching. Every new manager or banker with managerial aspirations in

9  Los Angeles under SOTOODEH's direction was required to attend.  This became known as the

10  "Retail Leadership Academy."

11      37.    SOTOODEH also built safeguards around a historically problematic annual

12  promotion called "Jump into January," during which sales goals were further inflated and bankers

13  competed against each other to open accounts, many of which ended up being of low quality.

14  SOTOODEH voiced his concerns about the "Jump into January" promotion with his superiors and

15  advocated for additional safeguards and compliance requirements, most of which were not adopted.

16  In addition to sharing his concerns with his superiors, SOTOODEH implemented an annual "Jump

17  into January" mandatory risk and ethics full-day training session, unique to his region, prior to the

18  campaign for all new Branch Managers and Service Managers.

19      38.    SOTOODEH also implemented an annual "Ethics and Risk Roadshow" where

20  business leaders in his region traveled around to give presentations to all branch-level employees on

21  various ethics, compliance, and risk issues.

22      39.    SOTOODEH further believed that the ethics certifications used by the BANK as a

23  whole were insufficient. Accordingly, SOTOODEH insisted that in his region, bankers would be

24  required to certify that they reviewed the ethics manual, and understood and abided by ethical rules,

25  four times a year - while bankers elsewhere in WELLS were only required to certify once a year.

26      40.    SOTOODEH also recognized that the BANK widely lacked accountability for certain

27

28

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

1  compliance programs, such as missing signatures on new accounts and high rates of unfunded

2  accounts. Though he could not impose restrictions on the core incentive system, he instituted

3  requirements that bankers in his region were not eligible to receive recognition awards (Community

4  Bank trips to Hawaii, e.g.) if they failed to meet thresholds for metrics such as funding rates, missing

5  signatures, customer service, or had concentrations of account types with questionable value

6  (ExpressSend, e.g.).

7  ### *D. SOTOODEH was diligent in identifying, escalating and remediating misconduct*

8      41.     When data or information about misconduct was provided to SOTOODEH, he acted

9  swiftly and decisively, escalating issues to proper internal investigation teams. When a broader issue

10 arose, he also sent messaging to every employee in his region, from manager to teller, that the

11 specific practice would not be tolerated and required re-certification of the employee ethics manual.

12     42.     SOTOODEH fostered a "see something, say something" culture in his region

13 encouraging employees to be vigilant and escalate any instances of unethical behavior so that it

14 could be investigated and remediated. As a result, his team identified a number of unethical practices

15 that were ultimately found to be BANK-wide. For example, SOTOODEH'S team discovered that:

16 bankers were receiving undue credit for selling multiple money-transfer accounts called

17 ExpressSend, bankers were able to open credit cards for customers without a signature, and that

18 bankers were opening multiple business-type accounts for regular consumer customers. This work

19 enabled the BANK to take corrective action to close loopholes and discipline bankers throughout the

20 BANK.

21     43.     SOTOODEH also worked to improve compliance data reporting to regional

22 management, which he believed would help identify and stem potentially systemic misconduct. He

23 was one of the key developers of the Quality of Sales Report Card that consolidated various

24 compliance metrics into one report - a report that was ultimately adopted BANK-wide.

25     44.     Still, the various departments in the BANK that possessed sales and account-use data

26 capable of identifying broader misconduct trends consistently refused to grant access to business line

27

28

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

leaders like SOTOODEH.  In fact, those departments actively withheld data analyses underlying the now infamous "simulated funding" fiasco for over a year after it was identified, as well as other supposedly trending misconduct. On information and belief, the rationale behind withholding these analyses was to prevent reputational damage to the BANK, even at the risk of allowing misconduct to proliferate. SOTOODEH and other business line leaders, were at one point told that they could not have access to the data because the BANK "didn't know what [they would] do with it."

**IV.    SOTOODEH Continually Pushed Against the Solutions Model--The Root Cause of the BANK's Problems**

45.      Although SOTOODEH was among the senior leaders of the BANK during his time in Los Angeles, he was not able to change the sales goals that were pronounced from the top of the Community Bank. He tried.

46.      The essential problem was related to over-aggressive sales goals and how the BANK compensated bankers. The way the BANK counted a sale essentially gave equal weight to the sale of a fifth debit card as it did to the opening of a million-dollar account. In other words, it failed to distinguish between the value of any particular sale to a customer, fostering an emphasis on quantity rather than quality. The core incentive system did not hold bankers accountable for unused or unfunded accounts, and more and more low-quality accounts were sold over time. Because senior management required that the sales goals grow year over year, without deference to the reality of local market opportunities, the problem was compounded and made worse on an exponential basis. The problem was most acute in urban regions such as Los Angeles, where there were many branches and too many bankers focused on trying to sell to the same customers.

47.      SOTOODEH disagreed with the focus on the sale of "widgets" without regard to customer value. As he became more senior, SOTOODEH repeatedly expressed in writing, in personal conversations, and in group meetings concern about the way the BANK measured success and incentivized its bankers. SOTOODEH's efforts to change the BANK'S model took many forms and involved many different topics - from the unrealistic growth rates senior management built into

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

the sales goals, to the inclusion of unused or improperly sold accounts in the ever-growing sales model, to the types of sales bankers were given incentive credit for, to the measurement of the BANK's "cross-sell" metric, to the necessary shift in focus to high-quality and actively used accounts, and more.

48.     Throughout this period the BANK touted its "cross-sell" number - the number of accounts per household in its customer base - in public securities filings and statements to investors as evidence of WELLS' economic health.  In reality, the emphasis on the sheer number of accounts meant that customers were encouraged by bankers to purchase useless products that provided little value to them, as evidenced by the fact that many of the accounts created were not activated, used or funded.

49.     SOTOODEH observed senior management state on multiple occasions that the high incidence of unused accounts was just a "cost of doing business," or expected "spillage" of a retail business (like inventory falling off a shelf and breaking). Further, the BANK seemed to support sales practices like selling additional "travel" or "shopping" accounts that boosted the BANK's sales figures but added no true value to customers. SOTOODEH prohibited those types of sales practices in his region, but on information and belief the BANK supported them by celebrating managers who encouraged the practices.

50.     SOTOODEH consistently urged senior management to only count the first checking or savings account toward sales goals, rather than counting duplicate or secondary accounts, which his research suggested were used at much lower rates. This idea was rejected.

51.     He urged management not to give credit for accounts that were not actively used. This idea was rejected.

52.     SOTOODEH shared his concern about the number of "unfunded" accounts that were being sold, but his concerns were dismissed by the BANK and compared to "buying a pair of jeans at the store that looked good in the mirror, but didn't look good when you got home".

53.     SOTOODEH and others who shared his concerns continued to raise issues about the

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

BANK'S sales practices to senior managers and were shot down. They highlighted the risk of misconduct caused by the misalignment of goals and market opportunity, for instance, the fact that goals for Los Angeles bankers required them to sell more than two debit cards for every checking account that was opened.  The concerns were raised to the head of the Community Bank, to top compliance officials, to the Chief Risk Officer, and other senior executives. Little was done to change the BANK'S policies. The response from senior management to suggestions for change was consistently dismissive and at times retaliatory. SOTOODEH and others were told they were being "anti-solutions" and to "get on board."

54.     In 2011, SOTOODEH, with the help of his regional finance team, conducted an analysis showing that 800,000 accounts should be removed from the sales plan because they were unfunded, unused or otherwise improperly opened. He was told by superiors that the bankers had been paid for them in the previous year, so would have to carry the burden of having them in the sales plan the next year. SOTOODEH conducted a similar analysis in 2013, pleading with the BANK to remove accounts from the sales plan that had been opened using suspected simulated funding, and received the same response. The BANK therefore knew there were unused and improper accounts in the solutions model, and not only refused to remove them, but built on top of them for the next year's goals.

55.     In 2013, after the BANK refused to remove improper sales from its model that had been impacted by simulated funding, SOTOODEH presented an analysis that revealed more than 500,000 debit cards built into the sales goals were improper and unattainable without acting unethically. He feared additional misconduct could occur if bankers were pressured to sell those accounts. Since the BANK was unwilling to adjust the model, he proposed to keep those goals at his own incentive level, but not hold the teams reporting to him accountable for them - sacrificing his own compensation if the targets were missed, while not pressuring his teams to act inappropriately. His proposal was rejected.

56.     In 2014, SOTOODEH presented an analysis to senior management in the Community

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

BANK that demonstrated more than half of certain types of accounts had been closed within one year, demonstrating that bankers were focusing on selling low quality accounts. That same year, he discovered that WELLS retained debit cards on its books (which supported the BANK'S cross-sell numbers) that had not been activated or remained unused for as many as 40 months. He immediately raised concerns to his superiors that products considered "junk" accounts were supporting evermore unrealistic sales expectations for more than three years.

57.     During 2013-14, PLAINTIFF went so far as to develop an alternative business model that sought to change the way bankers were incentivized. SOTOODEH wanted to de-emphasize sales of low-value accounts and focus on high value accounts that customers would actually use. SOTOODEH worked on the alternative model for nearly a year, but senior management consistently withheld key data and avoided hearing the presentation. When the presentation was finally made, the head of the Community Bank chose not to participate; her executive team listened politely and then proceeded to ignore the proposal. In frustration, SOTOODEH even offered to tie his own compensation to the success of his alternative model but was not allowed to even pilot it in limited markets. Ironically, several components of the model proposed by SOTOODEH were ultimately adopted in 2016, and then, only after the scandal broke and the BANK was under external pressure to reform.

58.     In late 2014, SOTOODEH was promoted to Regional Bank Executive, based in Texas.  For the first time, late in 2015, he was in a position where his signature was required for the sales goals to be approved. SOTOODEH, working with his management team, was able to provide a "bottom-up" goal that more realistically aligned with the market opportunity.  However, SOTOODEH was told to change his goals back to the "top-down" sales plan given to him by Community Bank leadership, which exceeded what his team believed was realistic.  Putting his career at risk, SOTOODEH refused to sign the proposed "top-down" sales plan issued by Community Bank leadership.  Ultimately, Community Bank leadership conceded to use his "bottom-up" goals.  By that time the following year, the BANK's problems had become public knowledge.

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

**V.    The BANK Retaliated Against SOTOODEH On the Eve of His Testimony to Regulators**

59.    In fall of 2016, after public disclosure of certain problems within WELLS, the BANK's Board hired outside counsel to conduct an internal investigation. SOTOODEH cooperated in the investigation, describing his assessment of the BANK's problems, as well as his efforts to corral and prevent those problems through systematic change. Even though SOTOODEH for a period of time presided over a Los Angeles region at the center of sales practice scrutiny, that internal investigation stated: … "multiple witnesses described SOTOODEH as having made significant attempts to improve the sales culture in Los Angeles," and discussed his instituting an employee recognition system and training initiatives to improve compliance.

60.    SOTOODEH cooperated in numerous internal investigations. Although the BANK was legally obligated to indemnify SOTOODEH, the BANK insisted that, in return for paying for his counsel, (something they were legally responsible for doing under the Labor Code) that he cooperate with the BANK and share information about what he intended to communicate to regulators. As a result, the BANK was aware of SOTOODEH's efforts to change the BANK's sales models.  The BANK was also aware, or should have been aware, of SOTOODEH's role as an internal whistleblower trying to effectuate change to foster greater compliance.

61.    Shortly before Mr. SOTOODEH was scheduled to meet with the Securities and Exchange Commission, the Department of Justice, and the FBI, the BANK, knowing Mr. SOTOODEH's intention to disclose his role as a whistleblower, notified him that he was being terminated.  Based on its internal investigations, the BANK knew that there was no basis to find that Mr. SOTOODEH had engaged in any wrongdoing.  Therefore, the termination was carried out in a retaliatory manner and Mr. SOTOODEH was expressly told that he was being terminated "without cause" whereas others who were culpable were terminated "for cause."

62.    Until he was terminated, he was led to believe by Senior BANK officials, that his job was safe. He was told he was part of the future of the BANK and would be an essential part of building a new and better bank. In fact, SOTOODEH was offered a new position that required him to

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

relocate his family to another state to serve as Lead Regional President for the Mountain Midwest. As incentive to take that position, he was promised certain material relocation benefits, including the following:

a.      A lump sum allowance of $11,300.00;

b.      A guaranteed buyout of his home in Texas at a predetermined price;

c.      Corporate furnished temporary housing for up to 2 months in the new location;

d.      Duplicate housing reimbursement for up to 2 months;

e.      Professional household goods move;

f.      Up to 2 months household goods storage; and

g.      Gross-up on all taxable benefits.

63.      Based on the promises he was made, SOTOODEH forwent the possibility of securing other potential employment options, accepted the position and relocated to Colorado and, as instructed by the BANK, he entered into an extended long-term property lease that the BANK promised to pay for.  After his termination, the BANK refused to pay for the lease and reneged on several material relocation promises SOTOODEH relied upon in accepting the position in Colorado.

**VI.   The Termination Damaged Plaintiff**

64.      Despite the lack of any evidence of misconduct by PLAINTIFF, the termination was carried out in a way that damaged PLAINTIFF'S reputation, imperiled his earnings capacity, and has cost him millions of dollars - all while WELLS reneged on its written and oral promises which had been offered as an inducement to remain as an employee earlier in 2017.

65.      It is clear that SOTOODEH's termination was wrongful and constitutes unlawful retaliation for his being a whistleblower. He was retaliated against for opposing the flawed sales goals, incentive plans, and risk controls that led to unlawful conduct at the BANK and based on his planned testimony before the DOJ and SEC, and other regulators, testimony that was going to be damning for the BANK and its senior most executives. This testimony has laid out, in detail, not

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

only is what described herein, but even greater details of the BANK'S pattern and practice of blatant and willful violation of state and federal laws, regulations, and requirements of financial institutions. While the BANK said that SOTOODEH'S termination was "without cause" it is clear that the cause for his summary termination was retaliation by the executives his testimony was bound to impact and the consequences it would cause to the BANK.

## FIRST CAUSE OF ACTION

### Retaliation in Violation of California Labor Code Section 1102.5

66.     By this reference, PLAINTIFF hereby incorporates each and every paragraph set forth above as though fully set forth at this place.

67.     PLAINTIFF asserts that WELLS retaliated against him in Violation of Labor Code Section 1102.5, and alleges as follows:

68.     WELLS was PLAINTIFF'S employer, and/or acting on behalf of PLAINTIFF'S employer.

69.     WELLS retaliated against PLAINTIFF after PLAINTIFF disclosed information, or because DEFENDANT believed that PLAINTIFF might disclose information, to investigators, federal regulators, [including but not limited to the SEC, OCC and FBI, and independent auditors] which PLAINTIFF reasonably believed violated one or more state or federal laws, regulations, rules or prohibitions.

70.     WELLS retaliated against PLAINTIFF after PLAINTIFF repeatedly identified, communicated, and voiced to THE BANK's Senior Management and Regulatory Compliance Officers, his opposition to conduct which he reasonably believed violated one or more local, state and/or federal statutes, regulation and/or restrictions, and/or that the BANK was in non-compliance with its ethical and legal responsibilities.

71.     WELLS retaliated against PLAINTIFF after PLAINTIFF refused to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

1   with a local, state, and/or federal and/or state rule or regulation.

2       72.    PLAI                                 would have resulted in a violation of or

3   noncompliance with a local, state, or federal rule or regulation.

4       73.    THE BANK materially altered the terms and conditions of PLAINTIFF'S

5   employment and/or terminated PLAINTIFF'S employment, and/or instructed its agents and

6   employees to alter the terms and conditions of PLAINTIFF'S employment and/or to terminate

7   PLAINTIFF'S employment.

8       74.    PLAINTIFF'S disclosure of information, and/or THE BANK'S perception that he

9   would disclose information of the type identified above, and/or his actual or perceived refusal to

10  participate was a substantial motivating reason(s) for WELL'S decision to terminate PLAI

11  employment.

12      75.    PLAINTIFF was harmed.  PLAINTIFF has suffered past and future special and

13  general damages, including wage loss, benefit loss, and emotional distress.

14      76.    WELL'S conduct was a substantial factor in causing PLAINTIFF's harm.

15      77.    The unlawful conduct alleged above was engaged in and/or ratified by the officers,

16  directors, and/or managing agents of WELLS, who committed the acts herein alleged maliciously,

17  fraudulently and/or oppressively in conscious disregard for PLAINTIFF's rights. PLAINTIFF is,

18  therefore, entitled to recover punitive damages from WELLS in an amount according to proof at

19  trial.

20      78.    As a result of the conduct of WELLS, PLAINTIFF was forced to retain an attorney in

21  order to protect his rights.  Accordingly, PLAINTIFF seeks the reasonable attorneys' fees and costs

22  incurred in this litigation in an amount according to proof at trial.

23      WHEREFORE, PLAINTIFF prays for judgment as set forth below.

24  \ \ \

25

26  \ \ \

27

28

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

## SECOND CAUSE OF ACTION

### Wrongful Termination in Violation of Public Policy

79.     By this reference, PLAINTIFF hereby incorporates each and every paragraph set forth above as though fully set forth at this place.

80.     PLAINTIFF asserts that DEFENDANTS wrongfully terminated his employment in violation of public policy, and alleges as follows:

81.     DEFENDANTS were PLAINTIFF'S employer (see Paragraphs 10 et sec.) above.

82.     DEFENDANTS terminated PLAINTIFF'S employment.

83.     At all times relevant hereto numerous statutes and regulations pertaining to and governing WELL'S banking activities were in full force and effect

84.     As referenced throughout this complaint, PLAINTIFF opposed, and reported unlawful conduct, or was perceived to have opposed or reported unlawful conduct, or perceived that he was about to report unlawful conduct, including but not limited to, that conduct which violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), 12 C.F.R. Part 30, Appendix D and the Consumer Financial Protection Law, codified in 12 U.S.C. § 5481.

85.     At all times mentioned herein, Labor Code Section 1102.5 was in full force and effect and establishes that the public policy of the State of California is, in part, to protect and safeguard the right and opportunity of all persons to seek and hold employment without retaliation for disclosure of unlawful or potentially unlawful activities.

86.     As referenced herein plaintiff opposed, was perceived to have opposed, or perceived that he was about to have opposed, unlawful conduct and was therefore entitled to protection under Labor Code Section 1102.5.

87.     Plaintiff was terminated in violation of the public policies enumerated in the above referenced statutes and other relevant statutes.

88.     PLAINTIFF was harmed.

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

89.    Plaintiff has suffered special and general damages, including wage loss, benefit loss, and emotional distress.

90.    The unlawful conduct alleged above was engaged in and/or ratified by the officers, directors, and/or managing agents of WELLS, who committed the acts herein alleged maliciously, fraudulently and/or oppressively in conscious disregard for SOTOODEH'S rights. PLAINTIFF is, therefore, entitled to recover punitive damages from WELLS in an amount according to proof at trial.

### THIRD CAUSE OF ACTION

### Breach of Contract

91.    SOTOODEH alleges that on or about May 18, 2017, he entered into a contract with WELLS whereby they promised him that, in return for his acceptance of a position that required him to relocate his family to Denver as the Lead Regional President for the Mountain Midwest region, he would receive certain relocation benefits including the following;

    a.    A lump sum allowance of $11,300.00;

    b.    A guaranteed buyout of his home in Texas at a predetermined price;

    c.    Corporate furnished temporary housing for up to 2 months in the new location;

    d.    Duplicate housing reimbursement for up to 2 months;

    e.    Professional household goods move;

    f.    Up to 2 months household goods storage; and

    g.    Gross-up on all taxable benefits.

92.    A copy of the terms of the contract are attached hereto as Exhibit A.

93.    SOTOODEH accepted the terms of the offer, forwent other employment options, relocated to Colorado and fulfilled all the terms and conditions of the contract.

94.    The BANK breached the contract by refusing to pay for the lease and reneged on several material relocation promises SOTOODEH relied upon in relocating to Colorado causing PLAINTIFF economic harm in excess of $975,000.00.

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

1

2   ///

3   ///

4   ///

5                                 **PRAYER FOR RELIEF**

6          WHEREFORE, PLAINTIFF makes the following demand:

7   **For the First and Second Causes of Action:**

8          a)      That process be issued and served as provided by law, requiring WELLS to appear

9   and answer or face judgment;

10         b)      That PLAINTIFF have and recover judgment against WELLS in an amount to be

11  determined at trial as special and general damages for its wrongful conduct;

12         d)      That PLAINTIFF have and recover a judgment against WELLS for punitive damages

13  in an amount to be determined at trial sufficient to punish, penalize and/or deter;

14         e)      That PLAINTIFF have and recover a judgment against WELLS in an amount to be

15  determined at trial for expenses of this litigation, including, but not limited to, reasonable attorneys'

16  fees and costs as permitted by law (i.e. for the statutory causes of action One through Five above);

17         f)      That PLAINTIFF have and recover a judgment against WELLS for all pre-judgment

18  and post-judgment interest; and

19         g)      That PLAINTIFF have such other relief as this Court deems just and proper.

20  **For the Third Cause of Action:**

21         a)      That process be issued and served as provided by law, requiring WELLS to appear

22  and answer or face judgment;

23         b)      That PLAINTIFF have and recover a judgment against WELLS for consequential

24  damages in the amount of $1,000,000.00 and continuing daily;

25         c)      That PLAINTIFF have and recover a judgment against WELLS for all pre-judgment

26  and post-judgment interest; and

27

28                              COMPLAINT - PAGE 22

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

1      d)     That PLAINTIFF have such other relief as this Court deems just and proper.

2  DATED:  August 30, 2021        DOLAN LAW FIRM, P.C.

3                                 By:_____

4                                     CHRISTOPHER DOLAN

5                                      Attorney for PLAINTIFF SOTOODEH

6  DEMAND FOR JURY TRIAL

7  PLAINTIFF hereby demands Trial by Jury.

8  DATED: August 30, 2021         DOLAN LAW FIRM

9                                 By:_____

10                                  CHRISTOPHER DOLAN

11                                  Attorney for PLAINTIFF SOTOODEH

12             **PLAINTIFF DEMANDS A JURY TRIAL**

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

DocuSign Envelope ID: 92A29FC9-01FE-4295-8CCE-8D241D21CBC7



*Global Relocation*

# Relocation Benefits

Benefits for John Sotoodeh

- Lump sum allowance of $11,300
- Guaranteed buyout home sale
- Corporate furnished temporary housing for up to 2 months in your new location
- Rental search assistance, including up to 2 tours and required broker's fees
- Home search assistance, including home purchase closing costs
- Duplicate housing reimbursement for up to 2 months
- Professional household goods move
- Up to 2 months of household goods storage, if necessary
- Shipment of up to 2 vehicles if your move is over 500 miles
- Spouse or Partner job search counseling services
- Gross-up on all taxable benefits, unless otherwise noted

Together we'll go far



## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:**   **FEB-02-2022**

**TIME:**   **10:30AM**

**PLACE:**   **Department 610**
**400 McAllister Street**
**San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order   **without an appearance**   at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.   **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

Plaintiff  **must**  serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint. (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**